# EXHIBIT 3

JOHN P. REITMAN (State Bar No. 80579)
jreitman@lgbfirm.com
RODGER M. LANDAU (State Bar No. 151456)
rlandau@lgbfirm.com
JACK A. REITMAN (State Bar No. 283746)
jareitman@lgbfirm.com
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056

Attorneys for Plaintiff Official Committee of
Unsecured Creditors of the Chapter 11 Bankruptcy
Estate of Debtor Walldesign, Inc.

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>WALLDESIGN, INC., a subchapter S Corporation,<br><br>Debtor and<br>Debtor-in-Possession | Case No. 8:12-bk-10105-CB<br><br>Chapter 11<br><br>Adv. No.: |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WALLDESIGN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL RU BELLO, an individual and as trustee of the BELLO FAMILY TRUST, January 14, 1997; NANCY ANN BELLO, an individual and as trustee of the BELLO FAMILY TRUST, January 14, 1997; STEPHEN M. BELLO, an individual; CHRISTOPHER J. BELLO aka CHRISTOPHER JON BELLO, an individual; JOSEPHINE BELLO, an individual; BELLO FAMILY VINEYARD, LLC, a California limited liability company; RU INVESTMENTS, LLC, a California limited liability company; MICHAEL BELLO, LLC, a California limited liability | **COMPLAINT ON CLAIMS TO SET ASIDE AND RECOVER FRAUDULENT TRANSFERS; FOR RECOVERY OF PREFERENCE PAYMENTS; FOR RECOVERY OF POST-PETITION TRANSFERS; FOR RECOVERY OF ILLEGAL DIVIDENDS; FOR BREACH OF FIDUCIARY DUTY; FOR DISALLOWANCE OF PROOFS OF CLAIM; AND FOR EQUITABLE SUBORDINATION OF PROOFS OF CLAIM [WITH EXHIBITS]** |

LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 company; IMPERIAL BUILDING GROUP,
INC., a Delaware corporation; MB
2 INVESTMENT GROUP, LLC, a Nevada
limited liability company; BELLO
3 CONSTRUCTION COMPANY, LLC, a
California liability company;
4 PREMIER TRUST, INC., a Nevada
corporation, as trustee of the
5 IRREVOCABLE NANCY BELLO 2012
TRUST, dated December 19, 2012 and as
6 trustee of the IRREVOCABLE MICHAEL
BELLO 2012 TRUST, dated December 19,
7 2012; and, DOES 1-50, inclusive,

8                                    Defendants.

9

10     Plaintiff is the Official Committee of Unsecured Creditors (the "Committee") of the

11 chapter 11 bankruptcy estate (the "Estate") of Walldesign, Inc. ("Walldesign").  The Committee

brings this adversary proceeding on behalf of the Estate pursuant to 11 U.S.C. §§1103(c)(5) and
12
1109(b) and this Court's "*Order Approving Stipulation Granting Leave, Standing and Authority to*
13
*the Official Committee of Unsecured Creditors To Commence, Prosecute and Settle Certain*
14
*Claims of the Debtor's Estate*" entered May 13, 2013 [Docket No. 791].  As the Committee was
15
not formed until after Walldesign filed bankruptcy, the Committee does not have personal
16
knowledge of the facts alleged in this Complaint and therefore alleges those facts on information
17
and belief.
18
**JURISDICTION AND VENUE**
19
     1.     In accordance with the requirements of Local Bankruptcy Rule 7008-1, the Santa
20
Ana Division of the United States Bankruptcy Court for the Central District of California (the
21
"Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334,
22
because the claims asserted herein arise under title 11 of the United States Code or arise in or
23
relate to the Chapter 11 case of the debtor and debtor-in-possession, Walldesign, currently pending
24
in the Bankruptcy Court as case No.: 8:12-bk-10105-CB (the "Walldesign Bankruptcy Case").
25
The outcome of this adversary proceeding will have a significant effect on the Estate because it
26
will impact the disposition property of the Estate and the amount of money available for
27
distribution to creditors.  Certain of the claims for relief alleged in this Complaint constitute core
28

proceedings under 28 U.S.C. § 157(b).  Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders and judgment by the Bankruptcy Court.  Each defendant is hereby notified that Fed. R. Bankr. P. 7008(a) requires each defendant to plead whether the claims for relief alleged against such defendant are core or non-core and, if non-core, whether consent is given to the entry of final orders and judgment by the Bankruptcy Court.

2.      Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Walldesign bankruptcy case is pending in this district and division.  Pursuant to 28 U.S.C. § 1391, venue is also appropriate in this district and division because each of the defendants either resides in or is authorized to and regularly does carry out business in this district and many of their wrongful acts, omissions and/or conduct as complained of in this Complaint took place within this district.  Accordingly, this Court also has personal jurisdiction over each of the defendants.

## PARTIES

3.      Plaintiff Committee is the duly formed and acting Committee of Unsecured Creditors of the Estate of Walldesign.

4.      Defendant Michael Ru Bello ("Michael Bello") is an individual who resides in Orange County or Napa County, California.  At all relevant times, Michael Bello was responsible for overseeing the day-to-day business operations and financial performance of Walldesign, and involved in supervising all aspects of Walldesign's financial affairs.  Michael Bello is and at all relevant times was the sole owner of Walldesign.  Furthermore, Michael Bello is and at all relevant times was a trustee for the Bello Family Trust, settled on January 14, 1997.

5.      Defendant Nancy Ann Bello ("Nancy Bello") is an individual who resides in Orange County or Napa County, California.  Nancy Bello is and at all relevant times was (i) the wife of Michael Bello; and (ii) a trustee for the Bello Family Trust, settled on January 14, 1997.

6.      Defendant Stephen M. Bello ("Stephen Bello") is an individual who resides in Orange County, California.  Stephen Bello is the son of Michael Bello and Nancy Bello.

7.      Defendant Christopher J. Bello aka Christopher Jon Bello ("Christopher Bello") is an individual who resides in Orange County or Napa County, California.  Christopher Bello is the

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  son of Michael Bello and Nancy Bello.

2      8.      Defendant Josephine Bello is an individual who resides in Orange County or

3  Riverside County, California.  Josephine Bello is the mother of Michael Bello.

4      9.      Defendant Bello Family Vineyard, LLC ("Bello Vineyard") is a California limited

5  liability company with a principal place of business in Orange County or Napa County, California.

6  Bello Vineyard is and at all relevant times was wholly owned and controlled by Michael Bello

7  and/or Nancy Bello.

8      10.     Defendant RU Investments, LLC ("RUI") is a California limited liability company

9  with a principal place of business in Orange County, California.  RUI is and at all relevant times

10  was wholly owned and controlled by Michael Bello.

11      11.     Defendant Michael Bello, LLC is a California limited liability company with a

12  principal place of business in Orange County, California.  Michael Bello, LLC is and at all

13  relevant times was wholly owned and controlled by Michael Bello and/or Nancy Bello.

14      12.     Defendant Imperial Building Group, Inc. ("Imperial") is a forfeited Delaware

15  corporation with a principal place of business in Orange County, California.  Imperial at all

16  relevant times was owned by Michael Bello and by Stephen Bello and/or Christopher Bello.

17      13.     Defendant MB Investment Group, LLC ("MB Investments") is a Nevada limited

18  liability company with a principal place of business in Orange County, California.  MB

19  Investments is and at all relevant times was wholly owned and controlled by Michael Bello and/or

20  Nancy Bello.

21      14.     Defendant Bello Construction Company, LLC ("Bello Construction") is a

22  California limited liability company with a principal place of business in Orange County,

23  California.  Bello Construction is and at all relevant times was wholly owned and controlled by

24  Michael Bello.

25      15.     Defendant Premier Trust, Inc. as trustee of the Irrevocable Nancy Bello 2012 Trust,

26  dated December 19, 2012, and as trustee of the Irrevocable Michael Bello 2012 Trust, dated

27  December 19, 2012 ("Premier"), is a Nevada corporation with a principal place of business in Las

28  Vegas, Nevada.

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16.    Defendants Does 1 through 50, inclusive, are individually and/or jointly liable to the Estate for the conduct alleged below.  The true names and capacities, whether individual, corporate, associate or otherwise, of those Doe defendants are currently unknown to the Committee.  Accordingly, the Committee sues defendants Does 1 through 50, inclusive, by said fictitious names and will amend this Complaint to allege their true names and capacities when ascertained with certainty.  Each of the Doe defendants is an immediate or mediate transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Complaint or of the proceeds of such fraudulent, preferential, or other avoidable transfers, and did not take such property for value, in good faith, and without knowledge of the avoidability of such transfers, or is otherwise liable along with the named defendants for the wrongful acts and omissions and damages alleged in this Complaint.

## GENERAL ALLEGATIONS

### *Walldesign, Michael Bello, and Bello Related Entitles*

17.    Walldesign is a California corporation formed in 1983.  Until 2011, the company was engaged in the business of installing drywall, insulation, acoustical material, and plaster, and providing related services to single and multi-family construction projects in California, Nevada, and Arizona.

18.    At the head of Walldesign was its sole shareholder and President/Person-in-Charge, Michael Bello, who was ultimately responsible for overseeing the day-to-day business operations and financial performance of Walldesign, and involved in supervising all aspects of Walldesign's financial affairs.  Utilizing the financial success of Walldesign prior to 2007-2008, Michael Bello maintained an extravagant lifestyle, including a mansion in Newport Beach, California (recently sold by Mr. and Mrs. Bello or a Bello controlled entity), golf club and race horse track memberships, condominiums, luxury automobiles, and the like.

19.    Walldesign's financial success also enabled Michael Bello, individually, or along with his wife Nancy Bello and/or their adult children, Stephen Bello and/or Christopher Bello, directly or indirectly to (i) acquire and operate a thoroughbred horse racing stable in the early 2000s and then through Michael Bello, LLC (which owned the champion racehorse "Megahertz"),

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  formed in about 2008; (ii) acquire and operate commercial vineyards and a winery in Napa Valley

2  through Bello Vineyard, formed in about 2002; (iii)  accumulate a large pool of investment and

3  residential properties held by RUI[1]; (iv) form Imperial and operate an employee leasing company

4  for Walldesign; (v) form and operate MB Investments to hold real property purchased by Michael

5  Bello; and (vi) form and operate Bello Construction, which made a secured loan to Walldesign in

6  late 2011.  (Michael Bello LLC, Bello Vineyard, RUI, Imperial, MB Investments, and Bello

7  Construction are referred to collectively as the "Bello Related Entities").

8       20.       Unfortunately, when Walldesign began to face financial reversals, Michael Bello

9  failed to fully appreciate or ignored the magnitude and potential consequences of those reversals

10  and either could not or would not scale back Walldesign's or the Bello Related Entities' (into

11  which Michael Bello was diverting Walldesign's money) business operations or expenses or his

12  personal lavish lifestyle.  Instead, Michael Bello kept spending Walldesign's money – including

13  while, as set forth below, Walldesign was undercapitalized, insolvent, and unable to pay its debts

14  as they became due in the ordinary course of business.

15  ***The Financial Collapse of Walldesign***

16       21.       By 2007, Walldesign already was in financial difficulty.  The global economic

17  downturn that began in 2007 resulted in a major slowdown in the construction industry, and

18  Walldesign's revenues and work in progress sharply declined.  For its fiscal year ending October

19  31, 2007, Walldesign's gross revenues declined by 30%, and its gross profit on contract revenues

20  plummeted from 10.45% in 2006 to 1.95% in 2007.  As a consequence, Walldesign incurred a net

21  loss of $11.5 million in 2007.  This financial condition only worsened during the next four years.

22       22.       By mid-2007 (and possibly earlier), Walldesign was undercapitalized, insolvent,

23

24  [1]The following properties were leased to Walldesign by RUI: 4387 W. Sunset, Las Vegas, NV, 89118; 278 S. Hamilton Place, Gilbert, AZ 85233; 1308 6th Street, Norco, CA 92860; 139 Radio Road, Corona, CA 92879; 6648 Meany Avenue, Bakersfield, CA 93308; 4760 E. Cartier Avenue, Las Vegas, NV 89115; 100 S. Hamilton Street, Chandler, AZ 85225; 2550 Jason Court, Oceanside, CA 92056; 1900 Quail Street, Newport Beach, CA 92660; and 2350 Bristol Street SE, Newport Beach, CA 92660.  As a result of these leases, Walldesign paid RUI rent for the use of these properties.  Since the Petition Date, Michael Bello has caused RUI to liquidate the vast majority of RUI's real property holdings (all of the foregoing properties have been liquidated except 100 S. Hamilton Street, 1900 Quail Street, 4760 E. Cartier Avenue, and 2036 Corte Del Nogal), The properties were sold for a combined total of approximately $10 million.

28

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    and unable to pay its debts as they became due in the ordinary course of business.  In July 2008,

2    nine months into its 2008 fiscal year, Walldesign's then-auditor expressed substantial doubt about

3    the company's ability to continue as a going concern.  By its 2008 fiscal year-end, Walldesign's

4    gross revenues had dropped another 35%, from $167.5 million to $108.2 million.  Cash flow from

5    operations saw a comparable 33% drop.  The downward trend continued through fiscal 2009 until

6    January 2012.  By that time annual revenues were down to $43.3 million, cash flow from

7    operations was negative $2.5 million, work in progress was down to $11.3 million, and net capital

8    available to finance its business was negative $5.3 million.

9          23.    Walldesign filed for bankruptcy protection on January 4, 2012 (the "Petition

10   Date"). According to Walldesign's Schedules of Assets and Liabilities [Docket No. 66-3 (the

11   "Schedules")], its assets total approximately $16 million while its liabilities total approximately

12   $26 million.

13   ***The Distributions of Cash and Other Benefits to Michael Bello and Bello Related Entities from***

14   ***the Main Walldesign Bank Account at Comerica Bank***

15         24.    At all relevant times, Walldesign maintained its main corporate bank account at

16   Comerica Bank (the "Comerica Bank Account"), located in El Segundo, California.  That account

17   remained open until after Walldesign filed bankruptcy.  As a general matter, money from business

18   loans to Walldesign and cash receipts from Walldesign's business operations were received into

19   that account.  Similarly, Walldesign paid its business expenses from that account.  The Comerica

20   Bank Account was disclosed in the general ledger and other books and records of Walldesign.

21   Similarly, the flow of Walldesign's money into and out of that account also was disclosed in

22   Walldesign's records.  When Michael Bello personally signed the Schedules and Statement of

23   Financial Affairs [Docket No. 66-3 (the "SOFA")] filed in Walldesign's bankruptcy case, he

24   disclosed the Comerica Bank Account in those filings.

25         25.    Although the Comerica Bank Account was the business bank account for and

26   contained only the money of Walldesign, at Michael Bello's instruction payments were made from

27   that account to support his opulent life style and personal proclivities, including paying (i) to

28   operate Bello Vineyard; (ii) to operate Michael Bello LLC, his horseracing stable; (iii) to operate

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    other Bello Related Entities; (iv) to satisfy his significant personal tax liability; and (v) to service

2    various mortgage obligations of Michael Bello and Bello Related Entities.

3          **The Private Aircraft, The Ferrari, and The Rolls-Royce**

4          26.     Michael Bello also caused Walldesign to incur obligations and liabilities that far

5    outstripped Walldesign's ability to service them, and were not primarily for the benefit of

6    Walldesign.  In August 2008, Michael Bello caused Walldesign to purchase a Hawker Beechcraft

7    Model No. 900XP airplane (the "Aircraft") for $14,357,509, thereby incurring a loan in the

8    amount of approximately $12.3 million to do so.  This Aircraft loan obligated Walldesign to pay

9    debt service in the amount of $82,602.90 for sixty months, with a balloon payment of $10.5

10   million due in 2013.  Along with this already significant liability and expense, Walldesign also

11   paid maintenance, monthly hangar, insurance, fuel and pilot costs related to the ownership of the

12   Aircraft.

13         27.     Although the Aircraft was ostensibly for the purpose of Walldesign conducting its

14   business in California, Nevada, and Arizona, the Aircraft flight log from August 2008 to

15   December 2010 shows that the Aircraft was primarily used for the personal transportation of

16   Michael Bello, with numerous trips to destinations that had little, if anything, to do with the

17   business of Walldesign (with no Walldesign offices at or near the destination city).  Such

18   destinations included: Ruidoso, New Mexico; San Francisco, California; Napa, California; Paso

19   Robles, California; Palm Springs, California; Baltimore, Maryland; Teterboro, New Jersey; Boca

20   Raton, Florida; Los Cabos, Mexico; Fort Lauderdale, Florida; Provo-Caicos Islands; Sint Maarten,

21   Dutch Antilles; Opra Locka, Florida; Bangor, Maine; Paris, France; Famborough, England;

22   Gander, Canada; Seattle, Washington; Nashville, Tennessee; Wichita, Kansas; Aspen, Colorado;

23   Minneapolis, Minnesota; Louisville, Kentucky; Honolulu, Hawaii; Medford, Oregon;

24   Philadelphia, Pennsylvania; Chicago, Illinois; Green Bay, Wisconsin; Jacksonville, Florida;

25   Mammoth Lake, California; Boston, Massachusetts; Cleveland, Ohio; Grand Rapids, Michigan;

26   Toronto, Canada; Pinehurst, Oregon; and Newport News, Virginia.

27         28.     In addition to the significant debt service on the Aircraft, the costs to simply

28   maintain and use the Aircraft were significant in and of themselves: For example, the cost for

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Michael Bello to simply *use* the aircraft in 2011[2] for seven separate trips (to locations such as San

2   Antonio, Texas; Cabo San Lucas, Mexico; and Colorado Springs, Colorado, none of which were

3   related to the Walldesign business) totaled $58,960.00, which included $34,660.00 *in fuel alone*.

4   Walldesign paid these costs, not Michael Bello, and none of these costs were for the benefit of

5   Walldesign or its creditors.  Taking into account the use cost of the Aircraft alone (at $1,800.00 an

6   hour) and not including costs for a pilot, fuel, maintenance, etc., from August 31, 2008 until the

7   Petition Date, Michael Bello caused Walldesign to transfer at least $532,752.00 to himself via his

8   personal use of the Aircraft.

9         29.      Michael Bello also caused Walldesign to pay to service debt on his personal

10  vehicles – a Ferrari and a Rolls-Royce – from the Comerica Bank Account.  Michael Bello caused

11  Walldesign to pay $3,988.83 per month for the purchase of his Rolls-Royce, and $3,288.33 per

12  month for the lease of his Ferrari; Michael Bello also caused Walldesign to pay a $25,000.00

13  down payment on the Ferrari on February 2, 2010.  Neither of these vehicles had anything to do

14  with Walldesign or its business, and their associated payments were not for the benefit of

15  Walldesign or its creditors.

16  **Direct Disbursements to Michael Bello**

17        30.      As the President/Person-in-Charge of Walldesign, Michael Bello received a

18  salary of approximately $92,867.84 per year; payroll was paid on a weekly basis.  However,

19  included in the payroll (but not as part of Michael Bello's salary) were monthly distributions

20  of $12,000.00.  Therefore, in aggregate, Michael Bello's "payroll" totaled $236,867.84 per

21  year.  This sum was paid to Michael Bello every year from 2008 onward, including 2011, the

22  year prior to Walldesign's bankruptcy.

23        31.      This "payroll" figure, however, did not encompass the sum total of all

24  payments made *directly* to Michael Bello during the period 2008-2011 from Walldesign's

25  Comerica Bank Account.  Michael Bello also personally received from the Comerica Bank

---

[2] On December 27, 2010, Walldesign subleased the Aircraft to WTG Properties. WTG agreed to pay annual rent of
$360,000.00 to Walldesign for each year of usage of no more than 200 hours of flight time.  If WTG used the Aircraft
for more than 200 hours, it agreed to pay $1,800.00 per hour for each additional hour of usage.  Michael Bello's use of
the Aircraft was estimated based on the $1,800.00 per hour rental rate in the lease agreement for the Aircraft.

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 Account monthly wire transfers of $85,000.00 from November 13, 2007 until August 10,

2 2009, plus transfers of $15,000.00 and $62,000.00 on November 18, 2007 and October 21,

3 2008, respectively, for a total of $1,947,000.00 over that time period.

4      32.    In total, between November 13, 2007 and the end of 2011, Michael Bello

5 received direct payments from the Walldesign Comerica Bank Account of not less than

6 $2,809,471.00. Of that total, at least $1,947,000.00 is avoidable and recoverable as fraudulent

7 transfers.

8 **Disbursements to Bello Related Entities: Michael Bello, LLC, Bello Vineyard, the**

9 **Bello Family Trust, and RUI**

10      33.    Apart from the direct disbursements that Michael Bello received from

11 Walldesign's Comerica Bank Account, at Michael Bello's direction certain of the Bello

12 Related  Entities also either (1) received direct payments from that account, or (2) had

13 payments made on their behalf from that account to their, and not Walldesign's, third-party

14 vendors.

15      34.    Michael Bello, LLC is the entity that Michael Bello uses to maintain his

16 racehorse stable. In the four years prior to the Petition Date, Michael Bello, LLC received

17 significant payments directly from and had payments made on its behalf from Walldesign's

18 Comerica Bank Account. In total (from 2008 until the end of 2011), at Michael Bello's

19 direction Michael Bello, LLC received $310,187.50 in direct payments from Walldesign, and

20 contributed $52,000.00 to Walldesign, netting $258,187.50 to Michael Bello, LLC.

21 Furthermore, on June 23, 2008, Michael Bello caused Walldesign to wire transfer $250,000.00

22 to Churchill Downs, a famous horseracing track which is the site of the Kentucky Derby. All

23 told, the net amount paid to or for the benefit of Michael Bello, LLC (and therefore Michael

24 Bello) from Walldesign's Comerica Bank Account was not less than $508,187.50 in the four

25 years prior to the Petition Date. None of these payments were for the benefit of Walldesign or

26 its creditors.

27      35.    Bello Vineyard is the entity that Michael Bello uses to maintain his private

28 vineyard and winery in Napa, California, and the winery tasting room, located at 929 Main

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Street, St. Helena, CA 94574.  In the four years prior to the Petition Date, Bello Vineyard

2  received not less than $114,408.30 in payments directly from Walldesign's Comerica Bank

3  Account.  These payments were for the direct benefit of Bello Vineyard, and therefore Michael

4  Bello and/or Nancy Bello.  None of these payments were for the benefit of Walldesign or its

5  creditors.

6       36.  The Bello Family Trust held much of the residential real property and liquid

7  assets owned by Michael Bello until the mass-transfer of real property to MB Investments in

8  April of 2012[3], and the subsequent liquidation and transfer of these properties in late 2012 and

9  2013[4].  In the four years prior to the Petition Date, the Bello Family Trust received not less

10  than $1,470,000.00 in payments from Walldesign's Comerica Bank Account.  During that

11  same four year period, the Bello Family Trust paid $1,519,000.00 to Walldesign, for a net

12  benefit of $49,000.00 to Walldesign as it relates solely to the payments from the Comerica

13  Bank Account to the Bello Family Trust[5].  The payments made by Walldesign to the Bello

---

[3] On December 12, 2011, AB Calif Acquisition Corp., d/b/a Acoustical Material Services ("AB Calif") filed suit in the Superior Court for the State of California, County of Orange against Walldesign and Michael Bello individually for the payment of certain invoices (for the sale of acoustical materials to Walldesign) which were guaranteed by Michael Bello.  On March 27, 2012, AB Calif moved *ex parte* for a temporary protective order and a right to attach order against Michael Bello due to the fact that he was liquidating real property that he indirectly owned (through the Bello Family Trust), which threatened to render Michael Bello judgment proof.  That same day, Michael and Nancy Bello caused MB Investments to be formed.  On April 19, 2012, the court issued a tentative ruling granting a right to attach order with respect to Michael Bello's interests in real property.  On April 20, 2012, the court issued the right to attach order.  That same day, Michael and Nancy Bello, as co-trustees of the Bello Family Trust, quitclaimed the following properties to MB Investments: 1750 Oceanfront #5, Del Mar, CA; 38 Pelican Crest, Newport Beach, CA; 22 Canyon Terrace, Irvine, CA; 412 Goldenrod Avenue, Corona Del Mar, CA; 608 ½ Begonia Avenue, Corona Del Mar, CA; 1132 Lake Vista, Palm Desert, CA; and, 787 Platinum Drive, Palm Desert, CA.  One week later, on April 27, 2012, Michael and Nancy Bello, as co-trustees of the Bello Family Trust, quitclaimed the following additional properties to MB Investments: 8424 Saint Helena Highway, Napa, CA; and, 929 Main Street, Saint Helena, CA.  On May 14, 2012, AB Calif brought a second action, in part, for the avoidance of these transfers in the Superior California, County of Orange.

[4] Beginning in 2012, Michael Bello caused MB Investments to sell or transfer several of the properties described in footnote 3.  Notably, Michael Bello caused MB Investments to sell his primary residence located at 38 Pelican Crest for $9,495,000.00 in August, 2013.  Michael Bello caused MB Investments to transfer his 929 Main Street, St. Helena property back to himself and Nancy Bello, which was subsequently transferred to their son, Christopher Bello in August of 2013.  Furthermore, Michael Bello caused MB Investments to transfer Michael Bello's vineyard at 8424 Saint Helena Highway to Michael Bello and Nancy Bello, who then transferred their respective interests in the vineyard to the Irrevocable Nancy Bello 2012 Trust and the Irrevocable Michael Bello 2012 Trust, with defendant Premier as trustee, in January 2013.

[5] As explained in further detail below, this does not include the amounts disbursed by Michael Bello from the "secret" Preferred Bank account of Walldesign which was not recorded on the books and records of Walldesign.

Family Trust were not for the benefit of Walldesign or its creditors.

37.    As explained above, RUI was the "landlord" to Walldesign on each of the eleven facilities leased to Walldesign from 2003 until the Petition Date; RUI was and is wholly controlled and owned by Michael Bello.  During the four years prior to the Petition Date, Walldesign used the Comerica Bank Account to pay approximately $6.49 million to RUI for those leased facilities.  Although these payments were ostensibly for the benefit of Walldesign in that it received value (the ability to use the leased premises) in exchange for the lease payments, the lease agreements were not entered into at arm's length — Michael Bello was on both sides of the lease transactions, and Walldesign did not receive reasonably equivalent value for these leases.  For example, many of Walldesign's payments to RUI were not for expenses (rent, utilities, and property taxes) on property that was occupied or otherwise used by Walldesign as indicated by its books and records.  In the four years prior to the Petition Date, Michael Bello caused Walldesign to make at least $2,996,019.78 in payments to RUI, and a significant part of the payments made by Walldesign to RUI were not for the benefit of Walldesign or its creditors.  Fifty-three of those payments are designated "Advance to RU" on the Walldesign general ledger, and began approximately one year before the Petition Date (on December 17, 2010), and ranged in value from $10,000.00 to $90,000.00.  These payments were otherwise undocumented and were not for the benefit of Walldesign or its creditors.

38.    In total, in the four years prior to the Petition Date, approximately $7 million in net payments were made from the Comerica Bank Account to or for the benefit of Michael Bello, LLC, Bello Vineyard, the Bello Family Trust, and RUI.  These payments were not for the benefit of Walldesign or its creditors.

**Michael Bello's Personal Expenses Paid on the Comerica and American Express Credit Cards**

39.    In the four years prior to the Petition Date, Michael Bello incurred at least $82,673.61 in personal credit card charges on Walldesign's Comerica commercial credit card account (the "Comerica Card").  Michael Bello caused Walldesign to pay these charges from its Comerica Bank Account, despite the fact that these charges were for his personal expenses

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 │ only, and not for the benefit of Walldesign or its creditors.

2 │      40.     Further, in the four years prior to the Petition Date, Michael Bello incurred

3 │ charges of at least $79,130.66 on his personal American Express credit card (the "AMEX

4 │ Card"). Michael Bello also caused Walldesign to pay these charges from the Comerica Bank

5 │ Account, despite the fact that the AMEX Card was Michael Bello's personal credit card, and

6 │ that these charges were for personal expenses only, and not for the benefit of Walldesign or its

7 │ creditors.

8 │      41.     In total, Michael Bello caused Walldesign to pay $161,804.27 in personal credit

9 │ card charges in the four years prior to the Petition Date. Michael Bello also caused Walldesign

10 │ to pay $192,900.00 in miscellaneous personal expenses in the four years prior to the Petition

11 │ date. The payment of these charges and expenses from the Comerica Bank Account was for

12 │ the benefit of Michael Bello, and was not for the benefit of Walldesign or its creditors.

13 │ **Michael Bello's Real Property Expenses Paid for by Walldesign**

14 │      42.     As discussed above, Michael Bello had a keen interest in investing in real

15 │ property throughout Southern California and in the Napa Valley region of California, and

16 │ acquired several real properties in those areas. From the end of 2007 and through the end of

17 │ 2011, Michael Bello caused Walldesign to service his personal mortgage obligations on the

18 │ following properties: 317 E. Bay Front, Newport Beach, CA 92662; 1006 Cahuilla Falls, Palm

19 │ Desert, CA 92260; 1132 Lake Vista Drive, Palm Desert, CA 92260; and 8424 St. Helena

20 │ Highway, Napa, CA 94558. The payments made by Walldesign for these mortgages were for

21 │ the exclusive benefit of Michael Bello and Nancy Bello and were not for the benefit of

22 │ Walldesign or its creditors.

23 │      43.     The property commonly known as 317 E. Bay Front, Newport Beach, CA

24 │ 92662 had a mortgage with Comerica Bank, with debt service of $24,954.80 per month.

25 │ Michael Bello caused Walldesign to pay this amount from the Comerica Bank Account to

26 │ Comerica Bank[6] every month from March 2008 until June 2011, for a total of $948,282.40.

27 │

28 │ [6] The note on the E. Bay Front property was sold by Comerica Bank to BAC Home Loans in December of 2010. After that date, all mortgage payments were made to BAC Home Loans.

LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

44.     The property commonly known as 1006 Cahuilla Falls, Palm Desert, CA 92260 had a mortgage with Comerica Bank, with debt service of $27,287.05 per month.  Michael Bello caused Walldesign to pay this amount from the Comerica Bank Account[7] every month from November 2007 (with double payments made per month during the November 2007 – February 2008 period) until March 2011 for a total of $1,285,899.00.

45.     The property commonly known as 1132 Lake Vista Drive, Palm Desert, CA 92260 had a mortgage with Comerica Bank, with debt service of $11,061.19 per month. Michael Bello caused Walldesign to pay this amount from the Comerica Bank Account[8] approximately every month from November 2007 until June 2011 for a total of $486,962.36.

46.     The property commonly known as 8424 St. Helena Highway, Napa, CA 94558 (the vineyard of Bello Vineyard) had a mortgage with Comerica Bank, with debt service of $23,876.17 per month.  Michael Bello caused Walldesign to pay this amount from the Comerica Bank Account[9] approximately every month from November 2007 until June 2011, for a total of $1,050,551.48.

47.     Aside from the millions of dollars in mortgages that Michael Bello caused Walldesign to service during the four years prior to the Petition Date, Michael Bello also caused Walldesign to make payments from the Comerica Bank Account to RUI for its purchase and improvement of the property at 1900 Quail Street, Newport Beach, CA 92660, as follows: $676,590.84 on September 29, 2008; $10,000.00 on May 6, 2009; $10,000.00 on May 7, 2009; and $30,000.00 on May 8, 2009.  In total, Walldesign paid $726,590.84 for the purchase and improvement of the Quail Street property, which was for the benefit of RUI and therefore Michael Bello, and not for the benefit of Walldesign or its creditors.

48.     In sum, during the four years prior to the Petition Date, Michael Bello caused

[7] The note on the Cahuilla Falls property was sold by Comerica Bank to BAC Home Loans in December of 2010. After that date, all mortgage payments were made to BAC Home Loans.

[8] The note on the Lake Vista property was sold by Comerica Bank to BAC Home Loans in December of 2010.  After that date, all mortgage payments were made to BAC Home Loans.

[9] The note on the St. Helena property was sold by Comerica Bank to BAC Home Loans in December of 2010. After that date, all mortgage payments were made to BAC Home Loans.

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Walldesign to make $3,771,425.24 in mortgage payments for real properties owned by

2  Michael and Nancy Bello, and $726,590.84 in payments for the purchase and improvement of

3  the Quail Street property — a total of $4,498,016.08 in real property payments that were for

4  the benefit of Michael Bello and Nancy Bello. None of these payments were for the benefit of

5  Walldesign or its creditors.

6  **Michael Bello's Personal Tax Liability Paid by Walldesign**

7  49.  Walldesign was an S corporation.  As an S corporation, its tax liability was

8  "flow-through" – Michael Bello was personally responsible, as Walldesign's sole stockholder,

9  for the income tax liability for Walldesign.  Accordingly, Walldesign paid Michael Bello to

10  cover his Walldesign incurred personal tax liability.  However, such payments may have been

11  greater than what was necessary to cover Michael Bello's Walldesign incurred personal tax

12  liability.

13  50.  During the four years prior to the Petition Date, Michael Bello also caused

14  Walldesign to pay a very large amount of his own personal tax liability, which consisted of

15  taxes to the California State Franchise Tax Board, the Internal Revenue Service, and various

16  property taxes.

17  51.  With regard to the various non-property tax payments, Michael Bello caused

18  Walldesign to pay a total of $3,805,158.00 to various government entities and himself for

19  personal tax liability incurred during the four years prior to the Petition Date.  These payments

20  included: $2,150,000.00 to the Internal Revenue Service/U.S. Treasury Department;

21  $970,000.00 to the California State Franchise Tax Board; and $685,158.00 to Michael Bello

22  for other personal taxes.

23  52.  Michael Bello also caused Walldesign to pay $167,995.52 in property taxes on

24  residential and investment properties owned by Michael Bello, the Bello Family Trust, and

25  RUI during the four years prior to the Petition Date.

26  53.  In sum, during the four years prior to the Petition Date, Michael Bello caused

27  Walldesign to satisfy $3,973,153.52 of his personal tax liability.  These payments were at least

28  in part for the benefit of Michael Bello and not for the benefit of Walldesign or its creditors, in

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  an amount not yet known to the Committee.

2  **The Walldesign Loan to/from Michael Bello and Bello Construction**

3       54.     During the four years prior to the Petition Date, Michael Bello caused

4  Walldesign to make a nearly $4.5 million undocumented and unsecured loan to himself at an

5  interest rate of 2% per annum, a rate well below market rates at that time.  As of October 31,

6  2010, that loan had an outstanding balance of $4,337,783.00.  The repayment terms of the loan

7  were such that the loan would be repaid over 360 days.  As of the Petition Date, there was an

8  outstanding principal balance of $368,537.53 on Walldesign's loan to Michael Bello.

9       55.     There was a separate promissory note agreement dated December 20, 2011,

10  between Michael Bello and Walldesign that purported to memorialize a loan by Bello to

11  Walldesign in the amount of $130,000.00.  The December 20, 2011 note bore an interest rate

12  of 5% per annum, was due upon demand, and was secured by assets of Walldesign described

13  in a UCC-1 filing.

14       56.     There was also a second promissory note agreement dated December 21, 2011,

15  between Bello Construction and Walldesign which purported to memorialize a loan by Bello

16  Construction to Walldesign in the amount of $142,000.00.  The December 21, 2011 note bore

17  an interest rate of 5% per annum, was due upon demand, and was secured by assets of

18  Walldesign described in a UCC-1 filing.

19       57.     Offsetting Walldesign's loan to Michael Bello with Michael Bello and Bello

20  Construction loans to Walldesign results in a net distribution to Michael Bello of $96,537.53

21  (not taking into account the fact that the loan to Michael Bello bore a below market interest

22  rate and was unsecured) from the Comerica Bank Account.  This distribution, the below

23  market interest rate charged by Walldesign, and the purported security interests in

24  Walldesign's assets granted to Michael Bello and Bello Construction were for the sole benefit

25  of Michael Bello and not for the benefit of Walldesign or its creditors.

26  **Walldesign and Imperial Building Group**

27       58.     One of the many issues facing Walldesign during the four years prior to the

28  Petition Date was that it eventually became unable to acquire workers compensation insurance

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  in 2010; this was primarily due to the nature of the work in which Walldesign was engaged

2  and the number of claims filed against Walldesign's workers compensation insurance.

3      59.    Without workers compensation insurance, Walldesign would be unable to hire

4  workers and therefore would be unable to continue operating.  In order to avoid this problem,

5  Michael Bello, Stephen Bello, and Christopher Bello formed Imperial in 2010.  The purpose of

6  Imperial was to act as an "employee leasing company" for Walldesign — Imperial would hire

7  and acquire insurance for construction workers which would then be leased out to Walldesign

8  to work on Walldesign contracts.  In return, Walldesign transferred sums to Imperial,

9  including, but not limited to, 105% of the Walldesign payroll, which was $232,632.30 at the

10 time of the Petition Date, for the purpose of paying the "leased" Walldesign employees every

11 week, as Walldesign was on a weekly payroll schedule.  This was done for the express purpose

12 of providing Walldesign with insured workers for Walldesign contracts — Imperial had no

13 other operations.

14     60.    The extra 5% of the Walldesign payroll (approximately $11,630.00) was

15 transferred to Imperial every week for the benefit of Stephen Bello and Christopher Bello,

16 despite the fact that Stephen Bello and Christopher Bello provided no discernible services to or

17 for the benefit of Walldesign.  These payments to Imperial (apart from the Walldesign payroll

18 itself) were for the benefit of Imperial, Stephen Bello, Christopher Bello, and Michael Bello

19 and not for the benefit of Walldesign or its creditors.

20 *The "Secret" Walldesign Bank Account at Preferred Bank Used by Michael Bello to*

21 *Wrongfully Divert Walldesign Money for His Personal Benefit*

22     61.    On November 1, 2002, in the halcyon days of Walldesign, Michael Bello

23 opened a "secret" Walldesign corporate bank account at Preferred Bank (the "Preferred Bank

24 Account"), located in Irvine, California.  That account remained active through the end of

25 2011 and open until after Walldesign filed bankruptcy.  At all relevant times, Michael Bello

26 was the sole signatory on the Preferred Bank Account.  Michael Bello actively concealed the

27 existence of that bank account from his subordinate officers and managers at Walldesign.  For

28 example, the Preferred Bank Account was not disclosed in the general ledger or other books

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and records of Walldesign.  Similarly, the flow of Walldesign's money into and out of that

account also was not disclosed in Walldesign's records.  Moreover, although Michael Bello

personally signed the Schedules and SOFA filed in Walldesign's Bankruptcy Case, he did not

disclose the Preferred Bank Account in those filings.  Instead, the existence of that secret

account came to light as the result of an investigation by one of Walldesign's creditors.

Michael Bello kept the Preferred Bank Account secret for good reason – he was using

Walldesign's money in that account as a personal "piggy bank" for purposes unrelated to

Walldesign and from which Walldesign and its creditors obtained no benefit.

62.    At all relevant times, the Preferred Bank Account was funded with rebates and

refunds that Walldesign received from its materials suppliers.  As a large construction

subcontractor, Walldesign would buy in bulk materials used in the course of its business.  One

effect of Walldesign buying its materials in bulk was that certain of its suppliers would issue

rebates to lower the net cost to Walldesign or give Walldesign refunds for unused product

returned by Walldesign to its suppliers.  Apparently at Michael Bello's instruction, however,

instead of deducting the amount of the rebate or refund from the total amount of the invoice to

Walldesign, Walldesign's suppliers would issue a check to Walldesign for the difference.

Michael Bello would then deposit these rebate or refund checks into the Preferred Bank

Account rather than into Walldesign's account at Comerica Bank (*i.e.,* the Comerica Bank

Account) and would not report the receipt of that money on Walldesign's general ledger or

other financial books and records.  The checks that Walldesign received from its suppliers

ranged in size from as little as $30.00 to as much as $326,466.07.  From January 1, 2007

through December 14, 2011, Michael Bello deposited $7,533,147.95 of Walldesign's money

into the Preferred Bank Account.

63.    Predictably, the $7.5 million which was diverted into the Preferred Bank

Account was not used for the benefit of Walldesign or its creditors.  Instead, Michael Bello

used those funds to support his lavish lifestyle and personal proclivities, including but not

limited to (1) his Napa Valley winery; (2) his horseracing stable; (3) Las Vegas casino bills at

the MGM Grand and the Wynn; and (4) his AMEX Card bill.  A schedule of all payments

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  made out of the Preferred Bank Account from January 1, 2007 until January 24, 2012 is

2  attached hereto as Exhibit 1.

3       64.    Michael Bello also transferred at least $1,018,000.00 from the Preferred Bank

4  Account to the Bello Family Trust in the seven years prior to the Petition Date.  As discussed

5  in paragraph 35, the Bello Family Trust had paid the net amount of $49,000.00 to Walldesign

6  after offsetting sums that Walldesign had paid to the Bello Family Trust via Walldesign's

7  Comerica Bank Account.  However, offsetting that net amount with the $1,018,000.00

8  transferred from the Preferred Bank Account yields a total net distribution to the Bello Family

9  Trust of at least $969,000.00 from Walldesign during the seven years prior to the Petition

10  Date.

11       65.    With regard to Michael Bello's Napa Valley winery (*i.e.,* Bello Vineyard),

12  Michael Bello transferred significant sums from the Preferred Bank Account for the operation

13  of that hobby/business.  Specifically, Michael Bello used the Preferred Bank Account to pay

14  the salaries of Aaron Pott ($228,068.78) and David Abreu ($667,355.60), Bello Vineyard's

15  winemaker and vineyard manager (respectively).  Furthermore, Michael Bello paid

16  $220,350.00 from the Preferred Bank Account to service the first deed of trust on the Bello

17  Vineyard tasting room in St. Helena, California, held by Donald Buresh and Sharon Phillips.

18  Adding in other various wine related expenses paid via the Preferred Bank Account, Michael

19  Bello caused Walldesign to pay at least $2.25 million to support Michael Bello's wine

20  hobby/business during the seven years prior to the Petition Date.

21       66.    With regard to Michael Bello's horseracing stable (*i.e.,* Michael Bello, LLC),

22  Michael Bello transferred significant sums from Walldesign's Preferred Bank Account for the

23  maintenance of his stable and his continued participation in horseracing.  Specifically, Michael

24  Bello transferred $43,000.00 to Michael Bello, LLC, and $78,381.25 to the Del Mar

25  Thoroughbred Club, and paid other various horseracing related expenses for a total of at least

26  $140,000.00 in horseracing related expenses during the seven years prior to the Petition Date.

27       67.    Michael Bello also funded personal gambling excursions through the Preferred

28  Bank Account.  Specifically, Michael Bello spent at least $296,000.00 at the MGM Grand

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Casino Hotel, and $43,000.00 at the Wynn Las Vegas, for a total of at least $339,000.00 in Las

2   Vegas casino expenses in the seven years prior to the Petition Date.

3           68.     During the four years prior to the Petition Date, Michael Bello used the

4   Preferred Bank Account to pay $125,172.50 to XIV Karats, Ltd., a high end jewelry store in

5   Beverly Hills, California.

6           69.     During the four years prior to the Petition Date, Michael Bello also used that

7   account to pay $118,826.49 to Renix Corporation, dba Newport Boats for the purchase of a

8   boat.

9           70.     Michael Bello also paid his AMEX Card personal expenses totaling

10  $528,513.05 from the Preferred Bank Account during the four years prior to the Petition Date.

11          71.     In sum, Michael Bello used the Preferred Bank Account (and the funds of

12  Walldesign) to finance his personal lifestyle in the amount of not less than $7,901,338.77.  The

13  Preferred Bank Account was operated by Michael Bello for the express purpose of paying for

14  his personal expenses, and not for the benefit of Walldesign or its creditors.

**CLAIMS FOR RELIEF**

**First Claim for Relief**

**(Against all Defendants, To Avoid Intentionally Fraudulent Transfers of Money and
Other Property under 11 U.S.C. §§ 544(b) and 550(a), and Cal. Civ. Code §§ 3439.04(a)
and 3439.07)**

20          72.     The Committee incorporates by reference and realleges paragraphs 1-71 of this

21  Complaint.

22          73.     During the seven years prior to the Petition Date, Michael Bello caused

23  Walldesign to make transfers of its property, including money, and caused liens to be placed

24  on Walldesign assets, to or for the benefit of the defendants that exceeded the total amount, if

25  any, that defendants paid to Walldesign prior to and during such time period.  That excess

26  amount is referred to herein as the "7-Year Transfers."  At this time, the Committee lacks

27  sufficient information to specify the total amount of money and other property that comprise

28  all of the 7-Year Transfers; however, the total amount of the 7-Year Transfers exceeds

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  $18,000,000.00, and according to proof at trial.  The Committee will seek leave to amend this

2  Complaint when it has additional information concerning the money and other property that

3  Walldesign transferred to or for the benefit of the defendants.

4  74.    The 7-Year Transfers were made by Walldesign with the actual intent to hinder,

5  delay, or defraud its creditors.  Specifically, Michael Bello caused Walldesign to make these

6  transfers to or for the benefit of the defendants to fund his opulent personal lifestyle and

7  personal proclivities and not to sustain or promote the business of Walldesign, even though he

8  knew or consciously or recklessly chose to ignore facts known to him that strongly suggested

9  that Walldesign was in dire financial straits and was undercapitalized, insolvent, and unable to

10  pay its debts as they became due in the ordinary course of business.

11  75.    The defendants did not take any of the 7-Year Transfers for a reasonably

12  equivalent value and/or did not take such transfers in good faith.  Specifically, the defendants

13  (i) knew that they were being paid by Walldesign because they received checks, wire transfers,

14  or liens from that entity; (ii) knew or consciously or recklessly chose to ignore facts known to

15  them that strongly suggested that the goods and/or services, if any, that the defendants

16  provided in exchange for those payments or liens were not for Walldesign but rather were for

17  Michael Bello or an entity other than Walldesign; and (iii) knew or consciously or recklessly

18  chose to ignore facts known to them that strongly suggested the goods and/or services, if any,

19  provided by them for such payments or liens conferred no or less than substantially equivalent

20  value upon Walldesign.

21  76.    At all relevant times, the 7-Year Transfers were voidable under Cal. Civ. Code

22  §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims

23  against Walldesign that were and are allowable against its Estate under 11 U.S.C. § 502 or that

24  were not and are not allowable only under 11 U.S.C. § 502(e).  These creditors include,

25  without limitation, the members of the Committee and Carpenters Southwest Administrative

26  Corporation, State Compensation Insurance Fund, and A-Z Cellular World, Inc.

27  77.    At all relevant times, Michael Bello caused Walldesign to conceal from one or

28  more of its creditors, including one or more of the creditors identified in paragraph 76 of this

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Main Document    Page 22 of 47

1  Complaint, that it had made the 7-Year Transfers with the intent to hinder, delay, or defraud

2  one or more of such creditors, in that Michael Bello had caused such transfers to be made for

3  his personal benefit and not to benefit Walldesign or any of its creditors; and such fraudulent

4  transfers alleged in this claim for relief could not reasonably have been discovered sooner than

5  one year prior to the Petition Date because at all relevant times Walldesign was owned and

6  controlled by the perpetrator of those intentional fraudulent transfers, Michael Bello.

**Second Claim for Relief**

7

8  **(Against all Defendants, To Avoid Intentionally Fraudulent Transfers of Money and**

9  **Other Property under 11 U.S.C. §§ 544(b) and 550(a), and Cal. Civ. Code §§ 3439.04(a)**

10  **and 3439.07)**

11  78.    The Committee incorporates by reference and realleges paragraphs 1-71 of this

12  Complaint.

13  79.    During the four years prior to the Petition Date, Michael Bello caused

14  Walldesign to make transfers of its property, including money, and caused liens to be placed

15  on Walldesign assets, to or for the benefit of the defendants that exceeded the total amount, if

16  any, that defendants paid to Walldesign prior to and during such time period.  That excess

17  amount is referred to herein as the "4-Year Transfers."  At this time, the Committee lacks

18  sufficient information to specify the total amount of money and other property that comprise

19  all of the 4-Year Transfers; however, the total amount of the 4-Year Transfers exceeds

20  $15,000,00000, and according to proof at trial.  The Committee will seek leave to amend this

21  Complaint when it has additional information concerning the money and other property that

22  Walldesign transferred to or for the benefit of the defendants.

23  80.    The 4-Year Transfers were made by Walldesign with the actual intent to hinder,

24  delay, or defraud its creditors.  Specifically, Michael Bello caused Walldesign to make these

25  transfers to or for the benefit of the defendants to fund his opulent personal lifestyle and

26  personal proclivities and not to sustain or promote the business of Walldesign, even though he

27  knew or consciously or recklessly chose to ignore facts known to him that strongly suggested

28  that Walldesign was in dire financial straits and was undercapitalized, insolvent and unable to

*LANDAU GOTTFRIED & BERGER LLP ATTORNEYS AT LAW LOS ANGELES, CALIFORNIA*

26

1 | pay its debts as they became due in the ordinary course of business.

2 |         81.    The defendants did not take any of the 4-Year Transfers for a reasonably

3 | equivalent value and/or did not take such transfers in good faith.  Specifically, the defendants

4 | (i) knew that they were being paid by Walldesign because they received checks were from that

5 | entity; (ii) knew or consciously or recklessly chose to ignore facts known to them that strongly

6 | suggested that the goods and/or services, if any, that the defendants provided in exchange for

7 | those payments were not for Walldesign but rather were for Michael Bello or an entity other

8 | than Walldesign; and (iii) knew or consciously or recklessly chose to ignore facts known to

9 | them that strongly suggested the goods and/or services, if any, provided by them for such

10 | payments conferred no or less than substantially equivalent value upon Walldesign.

11 |         82.    At all relevant times, the 4-Year Transfers were voidable under Cal. Civ. Code

12 | §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims

13 | against Walldesign that were and are allowable against its Estate under 11 U.S.C. § 502 or that

14 | were and are not allowable only under 11 U.S.C. § 502(e).  These creditors include, without

15 | limitation, the members of the Committee and Carpenters Southwest Administrative

16 | Corporation, State Compensation Insurance Fund, and A-Z Cellular World, Inc.

17 |         83.    At all relevant times, Michael Bello caused Walldesign to conceal from one or

18 | more of its creditors, including one or more of the creditors identified in paragraph 82 of this

19 | Complaint, that it had made the 4-Year Transfers with the intent to hinder, delay, or defraud

20 | one or more of such creditors, in that Michael Bello had caused such transfers to be made for

21 | his personal benefit and not to benefit Walldesign or any of its creditors; and such fraudulent

22 | transfers alleged in this claim for relief could not have reasonably been discovered sooner than

23 | one year prior to the Petition Date.

24 | **Third Claim for Relief**

25 | **(Against all Defendants, To Avoid Constructively Fraudulent Transfers of Money and**

26 | **Other Property under 11 U.S.C. §§ 544(b) and 550(a) and Cal. Civ. Code §§ 3439.04(b)**

27 | **or 3439.05 and Cal. Civ. Code § 3439.07)**

28 |         84.    The Committee incorporates by reference and realleges paragraph 1-71 and 81

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 | of this Complaint.

2 |        85.     At all relevant times within the four years prior to the Petition Date, Walldesign (i)

3 | was insolvent, or became insolvent as a result of each such transfer; (ii) was engaged in or was

4 | about to engage in a business or a transaction for which its remaining assets were unreasonably

5 | small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably

6 | should have believed that it would incur, debts beyond its ability to pay as they became due.

7 |        86.     At all relevant times, the 4-Year Transfers were voidable under Cal. Civ. Code

8 | §§ 3439.04(b) or 3439.05 and Cal. Civ. Code § 3439.07 by one or more creditors who held

9 | and hold unsecured claims against Walldesign that were and are allowable against its Estate

10 | under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e).

11 | These creditors include, without limitation, the members of the Committee and Carpenters

12 | Southwest Administrative Corporation, State Compensation Insurance Fund, and A-Z Cellular

13 | World, Inc.

14 | **Fourth Claim for Relief**

15 | **(Against all Defendants, To Avoid and Recover Intentionally Fraudulent Transfers of**

16 | **Money and Other Property under 11 U.S.C. §§ 548(a)(1)(A) and 550(a))**

17 |        87.     The Committee incorporates by reference and realleges paragraphs 1-71 of this

18 | Complaint.

19 |        88.     During the two years prior to the Petition Date, Walldesign made transfers of its

20 | property, including money, and caused liens to be placed on Walldesign assets, to or for the

21 | benefit of the defendants that exceeded the total amount that such defendants paid to

22 | Walldesign prior to and during such time period.  That excess amount is referred to herein as

23 | the "2-Year Transfers."  At this time, the Committee lacks sufficient information to specify the

24 | total amount of money and other property that comprise all of the 2-Year Transfers; however,

25 | the total amount of the 2-Year Transfers exceeds $6,500,00000, and according to proof at trial.

26 | The Committee will seek leave to amend this Complaint when it has additional information

27 | concerning the money and other property that Walldesign transferred to or for the benefit of

28 | the defendants.

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

89.     The 2-Year Transfers were made by Walldesign with the actual intent to hinder,

delay, or defraud its creditors. Specifically, Michael Bello caused Walldesign to make these

transfers to or for the benefit of the defendants to fund his opulent personal lifestyle and

personal proclivities and not to sustain or promote the business of Walldesign, even though he

knew or consciously or recklessly chose to ignore facts known to him that strongly suggested

that Walldesign was in dire financial straits and was undercapitalized, insolvent and unable to

pay its debts as they became due in the ordinary course of business.

90.     The defendants did not take any of the 2-Year Transfers for a reasonably

equivalent value and/or did not take such transfers in good faith.  Specifically, the defendants

(i) knew that they were being paid by Walldesign because they received checks were from that

entity; (ii) knew or consciously or recklessly chose to ignore facts known to them that strongly

suggested that the goods and/or services, if any, that the defendants provided in exchange for

those payments were not for Walldesign but rather were for Michael Bello or an entity other

than Walldesign; and (iii) knew or consciously or recklessly chose to ignore facts known to

them that strongly suggested the goods and/or services, if any, provided by them for such

payments conferred no or less than substantially equivalent value upon Walldesign.

**Fifth Claim for Relief**

**(Against all Defendants, To Avoid and Recover Constructively Fraudulent Transfers of**

**Money and Other Property under 11 U.S.C. §§ 548(a)(1)(B) and 550(a))**

91.     The Committee incorporates by reference and realleges paragraphs 1-71 and 88

of this Complaint.

92.     The defendants did not take any of the 2-Year Transfers for a reasonably

equivalent value and/or did not take such transfers in good faith.

93.     At all relevant times within the two years prior to the Petition Date, Walldesign

(i) was insolvent, or became insolvent as a result of each such transfer; (ii) was engaged in or

was about to engage in a business or a transaction for which its remaining assets were

unreasonably small in relation to the business or transaction; or (iii) intended to incur, or

believed or reasonably should have believed that it would incur, debts beyond its ability to pay

LANDAU GOTTFRIED & BERGER
LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA